IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TINLEYSPARKS, INC., *et al.*   )
                               )
          Plaintiffs,          )
                               )
     v.                        )    No. 14 C 853
                               )
VILLAGE OF TINLEY PARK, *et*   )
*al*.                          )
                               )
          Defendants.          )


MEMORANDUM OPINION AND ORDER

This case is about a political struggle in the Village of
Tinley Park, Illinois ("Tinley Park" or "Village") between its
longtime mayor and his allies, on the one hand, and two Village
residents who ran for local office in April 2013 and lost.

The two losing candidates and their political organization
have filed suit against the Village, the mayor, and seventeen of
his supporters under 42 U.S.C. § 1983 alleging that Defendants
misappropriated public funds (Count I), suppressed political
speech (Counts II through V), and tortuously interfered with
their prospective economic advantages (Count VI).

Defendants have moved to dismiss the complaint for lack of
standing and failure to state a claim upon which relief may be
granted.  The individual Defendants also argue that they are

entitled to qualified immunity.  I grant Defendants' motion only
in part for the reasons stated below.

I.

At the motion to dismiss stage, I must accept Plaintiffs'
factual allegations as true and draw all reasonable inferences
in their favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A.

TinleySparks, Inc. ("TinleySparks") is a non-profit
corporation formed in 2010 to promote civic and political causes
in Tinley Park.  *See* Dkt. No. 80 ("Am. Compl.") at ¶ 7.  Stephen
E. Eberhardt ("Eberhardt"), a local attorney who ran for mayor
in April 2013, is the President of TinleySparks.  *Id*. at ¶ 8.
Karen Weigand ("Weigand"), who ran for a seat on the Village's
Board of Trustees in April 2013, is the Vice President of
TinleySparks.  *Id*. at ¶ 9.

Edward J. Zabrocki, Jr. ("Zabrocki") has been the Mayor of
Tinley Park since 1981.  He also leads a political organization
that was known as "Team Tinley 2013" during the April 2013
election cycle.  *Id*. at ¶ 11.  The Village Clerk, Patrick Rea,
and four of the six Village Trustees--David Seaman, Gregory
Hannon, Brian Maher, and Terrance "T.J." Grady--ran as Team
Tinley candidates in April 2013 and won reelection.  *Id*. at ¶¶
12-16.  The other two Village Trustees--Thomas Stanton and
Patricia Leoni--were appointed or selected to run for office by

Zabrocki, but are not alleged to have been Team Tinley candidates in April 2013.  *Id*. at ¶¶ 17-18.

Team Tinley's supporters include two political committees, "Citizens for Ed Zabrocki" and "Citizens to Elect Tinley Park Village Officials," both of which receive contributions from businesses seeking Village contracts or other financial rewards. *Id*. at ¶¶ 11, 32.  Until March 2013, Ronald and Judy Bruning ("the Brunings") served as the Chairperson and Secretary/Treasurer, respectively, of the two political committees supporting Team Tinley.  *Id*. at ¶¶ 19-20.  The Brunings own a floral business in Tinley Park, but also work for the Village.  *Id*. at ¶ 20.  Ronald Bruning is the Village's Zoning Administrator while Judy Bruning works as Zabrocki's personal assistant.  *Id*. at ¶¶ 19-20.  Martin Ward, who chairs the Village's economic development commission, replaced Ronald Bruning as Chairperson of "Citizens to Elect Tinley Park Village Officials" in March 2013.  *Id*. at ¶¶ 26, 32(d).

B.

The complaint describes a series of incidents before and after the April 2013 election in which Zabrocki and his political allies allegedly used taxpayer funds to promote Team Tinley candidates (Count I) and suppressed political speech at various public events (Counts II and III) and in online forums (Counts IV and V).

3

In Count I, Eberhardt and Weigand allege that the Village, Zabrocki, the Village Clerk, the six Village Trustees, and Judy Bruning misappropriated public funds in violation of the Due Process Clause by (1) using taxpayer money to conduct a political rally for Trustee Gregory Hannon in January 2012 when he announced his candidacy for the Illinois Senate in the Tinley Park Village Hall; (2) using their official, taxpayer-funded portraits in Team Tinley campaign materials before the April 2013 election; (3) using taxpayer money to commission a Village report, which "Citizens to Elect Tinley Park Village Officials" later used to attack Eberhardt and Weigand, on the cost of complying with Plaintiffs' requests under the Illinois Freedom of Information Act; and (4) allowing Judy Bruning to engage in political activities on Village work time. *Id.* at ¶¶ 35-52.

Count II lumps together six incidents leading up to the April 2013 election in which Zabrocki and his allies allegedly suppressed opposing political speech: (1) from June 2012 through August 2012, Ellen Clark ("Ms. Clark"), the appointed Chairperson of various public events in downtown Tinley Park, prohibited unnamed "volunteers" from circulating a petition at the Tinley Park Farmers' Market to have a term limits referendum question placed on the ballot for the November 2012 general

election despite the fact that Ms. Clark had personally circulated nominating petitions for Zabrocki and other Team Tinley candidates at the same event, *id.* at ¶¶ 24, 55-58; (2) on October 28, 2012, Ms. Clark directed Plaintiffs' volunteers to stop circulating nominating petitions for Eberhardt and Weigand at the "Halloween Kiddie Boo-Bash," *id.* at ¶¶ 59-62; (3) starting in October 2012, Marge Weiner, the appointed head of the Senior Services Commission who runs the Tinley Park Senior Center in a publicly owned building, prohibited Eberhardt and Weigand from engaging in political activities at Senior Center events even though she had personally circulated a nominating petition on Zabrocki's behalf at the Senior Center and allowed Zabrocki and Village Trustee Patricia Leonia to campaign at Senior Center events and, *id.* at ¶¶ 27, 63-73; (4) in early 2013, Thomas "Doc" Mahoney, who served as President of the Tinley Park Chamber of Commerce, denied Plaintiffs' requests to host a "Candidates' Forum," but later agreed to host such a forum before the March 2014 primary elections in which Eberhardt and Weigand were not candidates, *id.* at ¶¶ 28, 74-78; (5) in March 2013, after the Village removed a Team Tinley sign from a public park in response to Eberhardt's complaint, Ronald Bruning, the Village's Zoning Administrator, instructed private citizens to remove Plaintiffs' campaign signs from their private property, *id.* at ¶¶ 79-83; and (6) in April 2013, three days

before the election, Village Trustee Brian Maher threatened Norman Elftmann, a local restaurant owner, for displaying a sign supporting Eberhardt in his front yard, *id.* at ¶¶ 84-85.

3.

Count III focuses on Plaintiffs' efforts to engage in political speech at the "Discover Tinley Community Awareness Expo" ("Expo") held on March 23, 2013. The Village hosts the annual Expo at the Tinley Park Convention Center. *Id*. at ¶ 88. In January 2013, Eberhardt received a solicitation to participate in the upcoming Expo, whose stated goal was to "provide an opportunity for businesses and organizations to showcase the services available to our community." *Id*. at ¶ 89. The Expo reservation form expressly stated, however, that "no political groups or campaigning will be permitted at this event." *Id*. On February 8, 2013, the Village rejected Plaintiffs' request for booth space at the Expo on the ground that "the prohibition on political activity at this event will be enforced against all participants, including incumbents running for office." *Id*. at ¶ 92.

Meanwhile, the Village was allowed to have a highly visible booth at the 2013 Expo near the main entrance with a larger banner referring to Zabrocki and four other Team Tinley candidates. *Id*. at ¶ 93. These candidates posed for a photograph in front of the Village booth, which Team Tinley then

6

posted on its Facebook page along with the message: "Meet and Greet Team Tinley today at the Discover Tinley Community Expo." *Id.* at ¶ 96, Ex. J.  Plaintiffs claim that denying them booth space at the 2013 Expo while simultaneously allowing Zabrocki and his allies to campaign at the event violated their constitutional rights.

4.

In Count IV, Plaintiffs allege that Zabrocki, the Village Clerk, the Village Trustees, and two other Village employees unlawfully suppressed their speech on a Village-sponsored website.  The Village has established a Main Street Commission ("MSC") to promote small business growth in an area designated as "Downtown Tinley."  *Id.* at ¶ 108.  Donna Framke ("Framke") is the Village's Marketing Director and serves as the Staff Liaison to the MSC.  *Id.* at ¶ 21.  Zabrocki appointed Michael Clark and Richard Butkas, both of whom are Team Tinley supporters, to the MSC.  *Id.* at ¶¶ 23, 25.

In April 2011, the Village contracted with a marketing company run by Cathy Maloney ("Maloney") to assist the MSC.  *Id.* at ¶ 110.  Maloney subsequently developed a website and a Facebook page for Downtown Tinley.  *Id.* at ¶ 111.  In October 2012, Maloney told Eberhardt that his law firm could no longer post on the Downtown Tinley Facebook page because such posts were considered political messages in light of Eberhardt's

7

campaign for mayor. *Id.* at ¶ 113. Maloney then deleted prior posts by Eberhardt's law firm and refused to recognize TinleySparks as a contributor on the Downtown Tinley website. *Id.* at ¶¶ 114-15.

About one month later, in November 2012, the MSC announced a new "website sponsorship structure" that would allow participating businesses to reach a broader audience via an expanded website, an electronic newsletter, and e-mail features. *Id.* at ¶ 117. Plaintiffs allege that Zabrocki and his allies delayed implementation of the MSC's new sponsorship program until after the April 2013 elections to prevent Plaintiffs from communicating their views to a larger audience. *Id.* at ¶ 118. The MSC finally launched the new sponsorship program in August 2013. *Id.* Eberhardt informed Donna Framke, the Village's Marketing Director, that TinleySparks wanted to participate in the program and paid the required fee. *Id.* at ¶¶ 121-22. In October 2013, Framke told Eberhardt that the MSC was not moving forward with the sponsorship program due to lack of participation and returned TinleySparks's participation fee. *Id.* at ¶ 123.

The final incident described in Count IV is Mahoney's failure to attribute donations to TinleySparks (as opposed to Eberhardt's law firm) in two Downtown Tinley newsletters sent in January 2014. *Id.* at ¶¶ 126-29. Maloney failed to correct the

error when Eberhardt brought it to her attention even though she promptly corrected a similar error regarding MSC Chairman Michael Clark's business. *Id*. at ¶¶ 130-32.

5.

Count V alleges that Plaintiffs were subjected to "censorship" and "disparate treatment" on the Downtown Tinley Facebook page. In September 2013, the MSC established a policy that removed service businesses such as Eberhardt's law firm and TinleySparks from the list of users who could post directly to the Downtown Tinley Facebook page and established a "Social Media Subcommittee" to review proposed posts. *Id*. at ¶¶ 141-45. After this policy was adopted, the Social Media Subcommittee refused to share TinleySparks's posts relating to term limits and a small business event in November 2013 and a series of posts relating to public safety in January 2014. *Id*. at ¶¶ 156-64.

6.

Count VI alleges that Richard Butkus, Ellen and Michael Clark, and Cathy Maloney tortuously interfered with Eberhardt's and TinleySparks's "reasonable expectancy that their reputation and visibility would be enhanced, consequently resulting in new clients." Am. Compl. at ¶ 171.

In Count VII, Plaintiffs seek a specific injunction against all Defendants. This is a demand for relief rather than a separate legal claim. *See* Fed. R. Civ. P. 8(a)(2)-(3) (distinguishing between "claim[s]" and "demand[s] for relief"). Therefore, Count VII will be dismissed.

## C.

In their motion to dismiss, Defendants argue that (1) Plaintiffs lack standing to bring Counts I through V; (2) Counts I, II, III, and VI fail to state claims upon which relief can be granted; and (3) the individual Defendants are entitled to qualified immunity. As a housekeeping matter, the individual Defendants also argue that the claims brought against them in their official capacities are redundant with claims against the Village. Defendants are correct about this point of law, *see Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001), so I grant their motion to dismiss the official capacity claims.

## II.

I start with Defendants' facial challenge to standing, which requires me to accept the complaint's allegations as true. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443-44 (7th Cir. 2009) (distinguishing between facial and factual challenges to Article III standing).

To establish standing under Article III of the Constitution, Plaintiffs "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of [Defendants] and [is] likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "At the pleading stage, general factual allegations of injury resulting from [Defendants'] conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal quotation omitted).

A.

With regard to Counts I and III, Defendants argue that Plaintiffs have failed to allege a concrete and particularized injury because their claims are indistinguishable from any other Village taxpayer who might object to how public funds were spent.

The Supreme Court has long "rejected the general proposition that an individual who has paid taxes has a 'continuing, legally cognizable interest in ensuring that those funds are not used by the Government in a way that violates the Constitution.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 131

S. Ct. 1436, 1442-43 (2011) (quoting *Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587, 599 (2007) (plurality opinion)).  The rationale behind the general rule against taxpayer standing is that an allegedly unconstitutional expenditure of public funds "does not give rise to the kind of redressable 'personal injury' required for Article III standing." *Hein*, 551 U.S. at 599.  As Plaintiffs point out, however, "the interest of federal taxpayers with respect to the federal treasury [is] 'very different' from that of a municipal taxpayer challenging an allegedly illegal use of municipal funds." *Hinrichs v. Speaker of House of Representatives of Indiana General Assembly*, 506 F.3d 584, 591-92 (7th Cir. 2007) (quoting *Frothingham v.* Mellon, decided with *Massachusetts v. Mellon*, 262 U.S. 447, 487 (1923)).  "The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." *Frothingham*, 262 U.S. 486; *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 349 (2006) (reiterating distinction recognized in *Frothingham* between municipal taxpayers, on the one hand, and federal and state taxpayers).

It follows from these cases, which Defendants have not addressed or attempted to distinguish, that Plaintiffs have

standing to challenge the expenditure of municipal taxpayer funds on constitutional grounds.

B.

With regard to Count II, which lumps together six incidents of alleged interference with political speech, Defendants argue that Plaintiffs have failed to allege how they were personally injured by any these incidents. *See Lujan*, 504 U.S. at 560 n.1 (alleged injury must be "particularized" in the sense that it "affect[s] [Plaintiffs] in a personal and individual way").

Only one of the incidents alleged in Count II fails the particularized injury requirement. Recall that Ellen Clark allegedly prohibited unnamed volunteers from circulating a petition at the Tinley Park Farmer's Market to have a term limits referendum question placed on the ballot for the November 2012 election. Plaintiffs have failed to explain how this alleged infringement of the petitioners' free speech rights injured them in a personal way. Plaintiffs may have supported term limits too, but they cannot sue to vindicate someone else's First Amendment rights rather than their own. *See Powers v. Ohio*, 499 U.S. 400, 410 (1991) ("In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.").

Plaintiffs cite *SSDD Enterprises, Inc. v. Village of Lansing*, 1998 WL 326727, (N.D. Ill. June 12, 1998) (Pallmeyer, J.), for the proposition that "the rules of third-party standing are considerably relaxed, so much so that if a party establishes the threshold requirement of 'injury in fact'...it may freely assert the First Amendment rights of others." *Id.* at *10 n.23 (citing *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984)). This citation simply begs the question of how Plaintiffs were personally injured by Ellen Clark's refusal to allow supporters of a term limit referendum to collect signatures at public events in Tinley Park.

In contrast, Plaintiffs were injured in a personal way when (1) Ellen Clark allegedly prohibited campaign volunteers from circulating nominating petitions for Eberhardt and Weigand at the Hallowwen Kiddie Boo-Bash in October 2012; (2) Marge Weiner allegedly prohibited Eberhardt and Weigand from campaigning at the Tinley Park Senior Center; (3) Doc Mahoney allegedly rejected Eberhardt's request for the Tinley Park Chamber of Commerce to host a "Candidates' Forum"; (4) Ronald Bruning allegedly ordered some of Plaintiffs' political supporters to remove campaign signs from their private residences; and (5) Village Trustee Brian Maher allegedly threatened a local restaurant owner in April 2013 for displaying one of Eberhardt's campaign signs. All of these incidents plausibly hampered

Plaintiffs' campaigns for local office by making it harder for
them to get on the ballot, interact with voters, and show that
they had visible support in the community.

C.

In Count III, Plaintiffs allege that they were prohibited
from campaigning at the Discovery Tinley Expo in March 2013
while Zabrocki and other Team Tinley candidates were allowed to
campaign near the main entrance of the event.  *See* Am. Compl. at
¶¶ 91-92, 97.  Defendants' argument that Plaintiffs were not
harmed by this alleged viewpoint discrimination in deciding who
could campaign at the Expo is frivolous.  Plaintiffs clearly
lost the opportunity to interact with voters and spread their
political message at a major public event.

D.

Defendants argue that Plaintiffs lack standing to bring
Count IV for two reasons: (1) only Eberhardt's law firm--rather
Eberhardt himself--was injured when Cathy Maloney instructed him
to stop posting on behalf of his firm on the Downtown Tinley
Facebook page, deleted his earlier posts, and removed the firm
from the list of sponsors on the Downtown Tinley website and (2)
although Count IV alleges wrongful actions directed at
TinleySparks--i.e., delayed implementation of the MSC's new
sponsorship program until after the April 2013 election and
failing to recognize TinleySparks as a prize donor in a Downtown

15

Tinley newsletter--Plaintiffs did not suffer any injury as a result of these actions.

Plaintiffs counter that Eberhardt's law firm is a sole proprietorship rather than a separate legal entity, so he must be allowed to sue for any harms his business suffered. Indeed, Defendants have not cited any cases in which a court has applied the rule that "prohibits shareholders from suing to enforce the rights of the corporation" to an unincorporated sole proprietorship. *Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 754 (7th Cir. 2008). Therefore, Eberhardt has standing to sue for injuries that his law firm allegedly suffered.

As for Defendants' argument that Plaintiffs cannot sue for injuries suffered by TinleySparks, I note that TinleySparks is one of the named plaintiffs in this suit. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). TinleySparks was undoubtedly injured if, as alleged in Count IV, Cathy Maloney deliberately deprived the organization of a forum for communicating with Village residents and of public recognition for a donation. This is not to say that Count IV states a plausible constitutional claim. I hold only that TinleySparks has alleged a plausible Article III injury in Count IV of the amended complaint.

E.

Defendants' final standing argument is that Count V fails to allege an injury in fact because TinleySparks was supposedly allowed to post on the Downtown Tinley Facebook page ever after the MSC's Social Media Subcommittee implemented a new screening procedure in September 2013.

This argument overlooks the complaint's allegations that (1) TinleySparks was forced to file complaints before four of its posts were shared on the Downtown Tinley page in November 2013 whereas other businesses did not encounter similar resistance, *see* Am. Compl. at ¶¶ 154–55, and (2) the Social Media Subcommittee's outright refusal to share TinleySparks's posts about Zabrocki's comments on term limits, a "Small Business Saturday" event, and various public safety messages, *id.* at ¶¶ 156–60, 162, 164. Accepting these allegations as true, TinleySparks was plausibly injured by the Social Media Subcommittee's actions.

In sum, Defendants' standing arguments fail across the board with the exception of the incident in Count II where Ellen Clark allegedly prohibited unnamed volunteers from circulating a petition on term limits at two public events.

III.

Defendants' next set of arguments challenge the legal sufficiency of certain counts in the complaint.  A complaint is legally sufficient when it alleges "facts sufficient to show that [each] claim has substantive plausibility." *Johnson*, 135 S. Ct. at 347.

A.

With regard to Count I, Defendants argue that Plaintiffs have failed to state a plausible claim because they do not have a protected property interest in municipal taxpayer funds.

"[I]n any due process case where the deprivation of property is alleged, the threshold question is whether a protected property interest actually exists." *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011). "Property interests are not created by the Constitution but rather 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972).  "A protected property interest exists only when the state's discretion is 'clearly limited such that the plaintiff cannot be denied the interest unless specific conditions are met.'" *Booker-El v. Superintendent, Ind. State Prison*, 668 F.3d 896, 900 (7th Cir. 2012) (quoting *Brown v. City of Michigan City, Ind.*, 462 F.3d 720, 729 (7th Cir. 2006)).

Plaintiffs rely on Article VII, Section 1(a) of the
Illinois Constitution as the source of their protected property
interest in municipal taxpayer funds. *See* Am. Compl. at ¶ 36.
That provision states that "[p]ublic funds, property or credit
shall be used only for public purposes." Ill. Const. Art. VIII,
§ 1(a). The Illinois Supreme Court "has long recognized that
what is for the public good and what are public purposes are
questions which the legislature must in the first instance
decide. In making this determination, the legislature is vested
with a broad discretion, and the judgment of the legislature is
to be accepted in the absence of a clear showing that the
purported public purpose is but an evasion and that the purpose
is, in fact, private." *In re Marriage of Lappe*, 680 N.E.2d 380,
388 (Ill. 1997) (internal citations omitted).

The question at this stage is whether Plaintiffs have
plausibly alleged that the four expenditures of taxpayer funds
described in Count I lacked a public purpose and served purely
private interests. Plaintiffs object to the use of taxpayer
funds to (1) support Village Trustee Gregory Hannon's political
rally announcing his candidacy for the Illinois Senate; (2)
commission official portraits of Village officials that were
later used in campaign materials; (3) pay for a report on the
cost of complying with Illinois Freedom of Information Act
requests that was later used to attack Eberhardt and Weigand for

wasting government money; and (4) allow Judy Bruning to do political tasks for Zabrocki and his allies on Village work time. It is at least plausible that Defendants sought to advance their private political objectives rather than any public purpose in each of these instances. Whether Plaintiffs can support these allegations with evidence is a question for another day.

In sum, Plaintiffs' have stated a plausible due process claim based on their allegations that Defendants spent municipal taxpayer funds to advance their private interests without any corresponding public benefit.

B.

Defendants argue that Count II should be dismissed under Rule 12(b)(6) because two of the individuals who allegedly violated Plaintiffs' free speech rights, Ellen Clark and Doc Mahoney, are not state actors.

"Anyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." *Filarsky v. Delia*, 132 S. Ct. 1657, 1661 (2012) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922. 937 (1982)). The Supreme Court has established "a two-part approach to this question of 'fair attribution.'" *Lugar*, 457 U.S. at 937.

> First, the deprivation must be caused by the exercise of some right or privilege created by the State or by

a rule of conduct imposed by the state or by a person
for whom the State is responsible.

Second, the party charged with the deprivation must be
a person who may fairly be said to be a state actor.
This may be because he is a state official, because he
has acted together with or has obtained significant
aid from state officials, or because his conduct is
otherwise chargeable to the State. Without a limit
such as this, private parties could face
constitutional litigation whenever they seek to rely
on some state rule governing their interactions with
the community surrounding them.

*Id.* (paragraph break added).

According to the complaint, Zabrocki appointed Ellen Clark
as the Chairperson of various public events in Tinley Park,
including the "Halloween Kiddie Boo-Bash" in October 2012. *See*
Am. Compl. at ¶¶ 24, 62. Defendants argue that Ellen Clark is
not a state actor, yet they completely overlook the fact that
she was appointed by the mayor, i.e., she exercised a "right or
privilege created by the [Village]." *Lugar*, 457 U.S. 937.
Moreover, when Ellen Clark prohibited Plaintiffs' campaign
volunteers from circulating nominating petitions at the
"Halloween Kiddie Boo-Bash," she plausibly gave this order
pursuant to her authority as Zabrocki's appointed organizer of
the event. In light of these allegations, I cannot say as a
matter of law that Ellen Clark was a private actor who falls
outside the ambit of Section 1983.

The same is not true of Doc Mahoney, who allegedly refused
to schedule a "Candidates' Forum" sponsored by the Tinley Park

Chamber of Commerce before the April 2013 election. Plaintiffs say nothing about how Mahoney became President of the Chamber of Commerce. Therefore, I have no basis for inferring that Mahoney's position was a "right or privilege created by the [Village]" as opposed to a purely private endeavor. *Lugar*, 457 U.S. 937. Indeed, Plaintiffs have not even attempted to explain why Doc Mahoney should be considered a state actor in their response brief. Therefore, I grant Defendants' motion to dismiss him from Count II.

C.

With regard to Count III, Defendants argue that Plaintiffs' own allegations show that the ban on political activity at the Expo was enforced without regard to a speaker's viewpoint. This argument ignores Plaintiffs' allegations that Zabrocki and other Team Tinley candidates were allowed to "campaign and engage in political activity at [the Expo]" from a booth near the main entrance. *See* Am. Compl. at ¶ 97. Having allegedly turned the Discovery Tinley Expo into a forum for some political campaigning, Defendants could not engage in viewpoint discrimination. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). Yet that is exactly what Defendants allegedly did when they prohibited Plaintiffs from engaging in political activity at the Discovery Tinley Expo

while allowing Zabrocki and his allies to campaign at the event.
This is a facially plausible First Amendment claim.

As Defendants point out, however, "individual liability
under § 1983 requires 'personal involvement in the alleged
constitutional deprivation.'" *Minix v. Canarecci*, 597 F.3d 824,
833 (7th Cir. 2010) (quoting *Palmer v. Marion County*, 327 F.3d
588, 594 (7th Cir. 2003)).  The only individuals who were
allegedly involved in prohibiting Plaintiffs from participating
in the Discovery Tinley Expo are Zabrocki and the Village Board
of Trustees.  *See* Am. Compl. at ¶¶ 91-92, 99.  The remaining
Defendants named in Count III--i.e., Ronald Bruning, Judy
Bruning, Michael Clark, Donna Framke, Cathy Maloney, and Martin
Ward--are dismissed for failure to allege that they were
personally involved in any viewpoint discrimination.

### D.

Defendants make two arguments for dismissal of Count VI,
which alleges tortious interference with a business expectancy:
(1) TinleySparks cannot have a business expectancy because it is
a non-profit corporation and (2) Eberhardt cannot claim a loss
of a business expectancy on behalf of his law firm, which is not
a party to this suit.  Defendants have not cited any authorities
in support of the first argument, so I need not address it.  *See*
*Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012)
(arguments that are "underdeveloped, conclusory, or unsupported

by law" are waived).  As for the second argument, I have already
rejected it.

IV.

Defendants' final argument is that certain local officials
named in the complaint are entitled to qualified immunity.

"A government official sued under § 1983 is entitled to
qualified immunity unless the official violated a statutory or
constitutional right that was clearly established at the time of
the challenged conduct."  *Carroll v. Carman*, 135 S. Ct. 348, 350
(2014) (per curiam).  "A right is clearly established only if
its contours are sufficiently clear that 'a reasonable official
would understand that what he is doing violates that right.'"
*Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

A.

Starting with Count III, Defendants argue that Zabrocki and
other Team Tinley candidates "had no reason to believe that it
was impermissible for them to pose for a picture at the
Discovery Tinley Expo...and then post that photograph on a
Facebook page.  Nor was it unreasonable for them to believe that
they could meet and greet their constituents at the Expo."  Dkt.
No. 93 at 26-27.

Defendants' argument misconstrues Count III.  Plaintiffs
are not complaining about a mere photograph or the act of
shaking hands with constituents.  The essence of their First

Amendment claim is that Zabrocki and the Village Trustees issued a policy that purported to prohibit political activities at the Expo; denied Plaintiffs' application for booth space pursuant to this policy; and then set up a booth near the Expo's main entrance from which they campaigned and engaged in other political activities. *See* Am. Compl. at ¶¶ 89-97. The relevant question for qualified immunity purposes is whether the actions described above "violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll*, 135 S. Ct. at 350.

The Tinley Park Convention Center, where the Discover Tinley Expo was held in March 2013, is a "forum" under First Amendment doctrine--i.e., "a piece of public property usable for expressive activity by members of the public." *Ill. Dunesland Preservation Society v. Ill. Dep't of Natural Resources*, 584 F.3d 719, 722-23 (7th Cir. 2009). The stated purpose of the Discover Tinley Expo was "to provide an opportunity for businesses and organizations to showcase the services available to our community" and meet "with members of our community to advertise your product or service." Am. Compl. at ¶ 89. This purpose shows that the Convention Center, as used for the Discovery Tinley Expo, was a limited public forum--i.e., "a public facility limited to the discussion of certain subjects or

reserved for some types or classes of speaker." *Ill. Dunesland*, 584 F.3d at 723.

It is clearly established that the Village could restrict access to the Discovery Tinley Expo to "reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech [was] reasonable and not an effort to suppress expression merely because public officials oppose[d] the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46.  In other words, the Village "[could] forbid all political rallies [at the Expo], but it [could] not forbid one party's rallies while allowing another's." *Sefick v. Gardner*, 164 F.3d 370, 372-73 (7th Cir. 1998) (citing *inter alia Chicago Acorn v. Metro. Pier & Exposition Auth.*, 150 F.3d 695, 704 (7th Cir. 1998) ("government may not discriminate on political grounds in the terms of access to the nonpublic forums that it owns")).

Count III alleges that the Village, Zabrocki, and the Village Trustees violated Plaintiffs' clearly established right not to be excluded from a limited public forum based on their political views.  It follows that Zabrocki and the Village Trustees are not entitled to qualified immunity.

B.

Defendants' argument that Marge Weiner is entitled to qualified immunity fails for similar reasons.

26

Plaintiffs did not have an absolute constitutional right to campaign at the Tinley Park Senior Center. *See Protect Marriage Ill. v. Orr*, 463 F.3d 604, 606 (7th Cir. 2006) ("The fact that a public facility could be used for political speech doesn't require that it be made available for such use."). It is clearly established, however, that Ms. Weiner could not allow Zabrocki to campaign at Senior Center events while prohibiting Plaintiffs from doing so. *See Chicago Acorn*, 150 F.3d at 699 ("Clearly, [the state] is not permitted to pick and choose among the users of its facilities on political grounds.").

Count II plainly alleges that Ms. Weiner engaged in viewpoint discrimination with respect to which candidates could campaign at Senior Center events. *See* Am. Compl. at ¶¶ 69, 72. Based on these allegations, she is not entitled to qualified immunity.

C.

Defendants' final argument is that the individual Defendants named in Counts IV and V "had reason to believe, in good faith, that they were to create an atmosphere that promoted small business growth and that the Downtown Tinley website and Facebook page were not public forums which allowed political speech and campaigning." Dkt. No. 93 at 28-29.

In contrast to the Discovery Tinley Expo and the Tinley Park Senior Center, where Defendants allegedly favored one

political message over another, Counts IV and V contain no allegations that Zabrocki and other Team Tinley candidates were allowed to post political messages on the Downtown Tinley website or Facebook page while Plaintiff could not.  In other words, Plaintiffs are not complaining about viewpoint discrimination in a limited public forum in Counts IV and V. They are really complaining about Defendants' decision not to permit *any* political messages in these online forums. Plaintiffs have not cited any case holding that they have a right to post messages that could be perceived as political in online forums intended to promote small business growth. Indeed, the cases support the opposition conclusion: that Defendants could, consistent with the First Amendment, prohibit political messages on the Downtown Tinley website and Facebook page to preserve their intended purpose as small business forums so long as they refrained from engaging in viewpoint discrimination.  *Perry Educ. Ass'n*, 460 U.S. at 46.

In the absence of allegations that Plaintiffs were the victims of viewpoint discrimination on the Downtown Tinley website or Facebook page, the individual Defendants named in Counts IV and V are entitled to qualified immunity from damages, but not injunctive relief.  *See Denius v. Dunlap*, 209 F.3d 944, 959 (7th Cir. 2000) ("The doctrine of qualified immunity does not apply to claims for equitable relief.").

V.

Defendants' motion to dismiss is granted only in part for the reasons stated above.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: May 11, 2015